RANDY S. GROSSMAN
United States Attorney
Shane Harrigan
Fred Sheppard
Assistant U.S. Attorneys
California Bar No.: 115757/250781
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101
Tel: (619) 546-6981/8237
Emails: shane.harrigan@usdoj.gov
        fred.sheppard@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDULLAHI AHMED ABDULLAHI,<br>  aka "Phish,"<br>  aka "Fish,"<br><br>Defendant. | Case No.: 17CR0662-W<br><br>Date:   October 17, 2022<br>Time:  9:00 a.m.<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

# I

# INTRODUCTION

Defendant Abdullahi Ahmed Abdullahi ("Abdullahi") now faces sentencing by this Court following his conviction for providing material support to terrorists and conspiracy to provide material support to terrorists, in violation of 18 U.S.C. §§2339A(a) and 2.   The United States submits that a substantial sentence of 240 months' (20 years') imprisonment requested by the parties is appropriate and reasonable given the nature and seriousness of

Abdullahi's entire criminal conduct, the need to provide general deterrence, and the need to avoid unwarranted sentencing disparities

From approximately November 2013 through November 2014, Abdullahi, a Canadian national and former resident of San Diego, California, provided both money and persons to support violent jihadist activities, that is, the murder, kidnapping and maiming of persons in Syria.  From November 2013 through March 2014, Abdullahi encouraged, aided and financially assisted at least six North American nationals in traveling to Syria, where they joined the Islamic State of Iraq and Syria ("ISIS") and engaged in armed battles to gain control of the territories and civilian populations within Syria.  Following the departure of those foreign fighters, Abdullahi also caused money to be wired to third-party ISIS intermediaries in Gaziantep, Turkey for the purpose of continuing to support his coconspirators engaged in violent jihadist activities on the battlefield in Syria.

Most notably, in order to support these violent terrorist activities, Abdullahi committed a violent crime himself.  On January 9, 2014, Abdullahi and two cohorts, committed an armed robbery of an Edmonton, Canada, jewelry store for the purpose of financing the travel of two U.S. citizens to Syria to join and fight for ISIS – Douglas McCain, a San Diego resident, and Hand Mohallim, Abdullahi's 18-year old cousin from Minneapolis.

The depth of Abdullahi's commitment and support to the violent jihadist activities of ISIS is evidenced by his communications with the ISIS foreign fighters and coconspirators, in which he expressed a desire to join them on the battlefield and wished for the annihilation of those who opposed ISIS, e.g., "*I wish u the best and inshallah* [God willing] *we'll be all together on the front lines just like I been dreaming about lately*";  "*may allah bless ur hearts and fill it with joy and happiness on the front and may u brothers bring destruction to the cowards.*"

Ultimately, Abdullahi's actions not only contributed to the killings of persons in Syria at the hands of his coconspirators, but ultimately contributed to the death of all six coconspirators/ISIS foreign fighters.  Coconspirator Douglas McCain, the first American

15CR622-W

known to die fighting for ISIS, was reportedly killed on August 25, 2014, fighting against Free Syrian Army forces.  Thereafter, in or about November 2014, Abdullahi's three cousins from Edmonton, Canada, his 18-year old cousin from Minneapolis, and a third individual from Canada, were also reportedly killed in Syria while fighting for ISIS.

## II

## OFFENSE CONDUCT AND PROCEDURAL HISTORY

The Presentence Investigation Report ("PSR") accurately summarizes the offense conduct.  *See* PSR at ¶¶ 2-44.  As described in the PSR and herein, an investigation by agents from the FBI San Diego and Minneapolis Joint Terrorism Task Forces, the Royal Canadian Mounted Police (RCMP) revealed that, beginning in November 2013, a network of at least six individuals, including San Diego resident Douglas McCain, traveled from the United States and Canada to Syria, via Turkey, to join and fight for ISIS.  The investigation also revealed that Douglas and others were assisted in their travel by individuals in San Diego, Minneapolis and Edmonton, Alberta, Canada, including Abdullahi, a cousin of four of the travelers.

Although Abdullahi indicated he wanted to join his coconspirators in Syria and fight for ISIS, his main role was that of North American facilitator of ISIS foreign fighters.  In that role, Abdullahi aided the travel of U.S. and Canadian nationals to Syria to join and fight for ISIS.  He also raised and wired monies to foreign fighters to finance their travel to Syria and caused money to be sent to foreign fighters in Syria, via wires to Turkey.  Finally, he created and used email accounts so that foreign fighters, facilitators and recruits could communicate via "draft" email to avoid law enforcement detection.  Abdullahi and his coconspirators used these "draft" emails to recruit others to travel to Syria and join ISIS, coordinate their travel from North America to Syria, communicate regarding the financial and other resource needs of the foreign fighters, and relay information regarding ISIS' armed efforts to establish a Caliphate in Syria.

15CR622-W

### A.   Background on ISIS

ISIS continues to be a dominant terrorist threat in the world today, responsible for more deaths than any other terrorist or extremist group combined over the past several years. While ISIS has been largely defeated in its home territory of Syria and Iraq, it remains capable of launching attacks in those countries, and has also inspired individuals and affiliated groups to stage attacks in other parts of the world, including the United States.

ISIS is a descendent of al-Qaeda, but it has propagated an interpretation of jihadism both more urgent and aggressive than any previous group's.  Emerging in 2014, ISIS was formed when Emir Abu Bakr al-Baghdadi declared an Islamic Caliphate in parts of Iraq and Syria, following significant territorial gains in northern Iraq.  ISIS is distinguished by its brutality and the violence it asserts to control the population in its territories, justify its presence as a governing authority, and further its goals.  ISIS acts with religious, political and ideological objectives, and seeks to represent all Muslims around the world.  One of ISIS' goals is to establish a global caliphate, which extends beyond current political borders and is ruled by ISIS' version of Islamic law (Sharia law).  Although ISIS seeks to represent all Muslims, ISIS only considers a person Muslim if he or she espouses ISIS' Sunni brand of Islam.  All other Muslims, including Shia, are considered apostates.

ISIS has pursued its objective of a global caliphate through, among other means, the killing and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion, nationality or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence.  At its height of power, ISIS recruited thousands of foreign fighters from across the globe to assist with its efforts to expand its so-called caliphate in Iraq, Syria, and other locations in the Middle East and elsewhere.

In sum, ISIS has killed countless people, and seeks, without exaggeration, the destruction of the United States.  *See, e.g., United States Suarez*, 893 F.3d 1330, 1332 (11th Cir. 2018) ("[w]hen the FBI arrested Harlem Suarez, he had already declared allegiance to the Islamic State of Iraq and al-Sham (ISIS), attempted to recruit others to join him in

destroying the United States"); *Doe v. Mathis*, 889 F.3d 745, 749 (D.C. Cir. 2018) (ISIS "controls territory in Iraq and Syria, and has perpetrated and aided terrorism there and around the world, killing several thousand civilians, including American aid workers and journalists"); *United States v. Khusanov*, 731 F.App'x 19 (2d Cir. 2018) (noting that ISIS has a "history of particularly violent conduct" and "target[s] members of the United States armed forces serving abroad and encourage[s] terrorist acts within this county."

### B.   Abdullahi and his Relationship with his Coconspirators

At the time of the offenses, Abdullahi was a 30-year old Canadian national residing in Edmonton, Alberta, Canada.  Abdullahi is part of a larger extended family of Somali immigrants with ties to San Diego, Minneapolis and Edmonton.  This family included ISIS foreign fighters and coconspirators:

- Hamsa Kariye (cousin and Edmonton resident, 30 years old at time of death)
- Hirsi Kariye (cousin and Edmonton resident, 23 years old at time of death)
- Mahad Hirsi. (cousin and Edmonton resident, 20 years old at time of death)
- Hanad Mohallim. (cousin and Edmonton resident, 19 years old at time of death)

Abdullahi had a long standing and close relationship with cousins Hamsa and Hirsi, as well as ISIS foreign fighter, Douglas McCain (33 YOA at the time of his death) and his younger brother Marchello – both San Diego residents.[1]  At one time, Abdullahi, Hamsa, Hirsi, Douglas and Marchello and their families all resided in the Minneapolis area, before all eventually moving to San Diego in or after 2005.  During their time in San Diego, Abdullahi, Hamsa, Hirsi., Douglas and Marchello all maintained a close relationship with each other and also socialized with Troy Kastigar and Individual 1.[2]  ISIS foreign fighter Hanad and

---

[1]    Douglas and Marchello attended the same Minneapolis high school as Hamsa and Hirsi.  In about 2003, Douglas and Marchello converted to Islam.  Marchello also assisted his brother Douglas in his travels to Syria.  On January 12, 2018, Marchello was convicted of felon in possession of firearms and body armor and false statements involving international terrorism and sentenced to ten years' in custody. Crim. Case No. 15cr174-W.

[2]    Individual 1 is an associate of Abdullahi.  In 2009, Troy Kastigar, a Muslim convert, was reportedly killed in Somalia fighting for al-Shabaab, a militant Islamic terrorist organization.

his family were also residing in San Diego at that time.   Although he was much younger than Abdullahi, Abdullahi knew him through family gatherings.   After living in San Diego for approximately six years, in and around 2010 to 2012, Abdullahi, Hamsa, Hirsi and their families relocated to Edmonton, Canada, and Hanad and his family moved back to Minnesota.

    **C.**    **November 2014 – With the Knowledge, Encouragement and Financial Assistance of Abdullahi, Four Canadian Foreign Fighters to Travel to Syria to Join an Fight for ISIS**

In late 2014 and 2015, based on interviews of Hamsa and Hirsi's family conducted by the RCMP and investigation by JTTF agents, law enforcement learned that Hamsa Hirsi, and Mahad, as well as another Alberta, Canada resident, Omar Mohamed ("Omar")[3], had traveled together from Edmonton, Canada to Istanbul, Turkey (via Toronto) in early November 2013, and subsequently joined ISIS in Syria.   All four Canadian travelers purchased round trip tickets to/from Edmonton to Istanbul from the same travel agency. Hamsa flew to Turkey on November 10, 2013, and the next day Hirsi, Mahad and Omar also flew to Turkey on the same flight.   Airline records show that none of the four travelers used their return tickets.   Such activity is consistent with the tradecraft of other ISIS foreign fighters.   Turkey is a country ISIS foreign fighters frequently use as a gateway to enter Syria due to the porous border between the two countries.   Foreign fighters also frequently purchase round-trip tickets in order to disguise the purpose of their trip and avoid law enforcement detection.   Investigation by JTTF agents revealed that, after arriving in Turkey, the four Canadian travelers crossed the border into Syria where they joined ISIS and fought in armed battles as evidenced by several photos in social media posts:

---

[3]    Omar Mohamed, 25 years of age, was also reportedly killed in late 2014 fighting for ISIS.

15CR622-W



***Hanad (far left) Mahad (center w/ AK-47)*** [4]





***Hanad (w/ RPGs and AK-47)***        ***Hanad***

---

[4]     The caption reads "the qanima [Islamic term for property won in battle or loots] from Iraq has reached us Alhamdulillah [praise Allah](smiley emoji)."

1
2
3
4
5
6
7
8
9
10
11
12
13



Text My brother Abu Zubayr may Allah keep him steadfast... Kik zubayr_muhajir

*Hamsa*                                        *Hirsi*

Further investigation  by JTTF agents, which included obtaining approximately 60 draft email messages from an email account used by Abdullahi and his coconspirators[5], revealed that Abdullahi knowingly encouraged and assisted the four Canadian foreign fighters in traveling to Syria and fighting for ISIS.  In early November 2013, prior to departing for Turkey, Abdullahi, Abdullahi's brother ("A.A"), and the four Canadian travelers (Hamsa, Hirsi, Mahad and Omar) were living together and all working as pipe fitters at a Calgary, Alberta facility.   The four Canadian travelers all quit work two weeks later and traveled together by bus from Calgary to Edmonton for their flights to Istanbul. After the four Canadian travelers departed, Abdullahi and his brother A.A. continued to work for another two weeks.  After Hamsa departed Canada, Abdullah used Hamsa's credit/debit card to stay at a hotel near Edmonton, Canada and withdraw approximately $2,800 Canadian dollars (CAD) from Hamsa's account from various ATMs in Alberta,

---

[5]    The investigation revealed that Hamsa appeared to be the owner of the account. Several individuals including Abdullahi, Hamsa, Hirsi, Douglas, Marchello and Hanad, used the same email account, in which they typed emails saved as drafts, to communicate.  This allowed the coconspirators to communicate without ever sending an email, thereby avoiding law enforcement detection.

15CR622-W

Canada, for the purpose of sending money to Hamsa and the other foreign fighters.   In fact, Abdullahi's draft email communications show that Abdullahi was well aware that Hamsa, Hirsi, Mahad and Omar were traveling to Syria to engage in violent jihadi activities and promised to raise and send them money in support of their terrorist activities.   For example, in a draft email message to Hamsa, Abdullahi promised to send the foreign fighters "*every dime that's in* [his] *pocket,* including money from a tax return and money obtained from Hamsa's bank account.   Abdullahi recounted how he was able to withdraw $2,800 CAD from Hamsa's account for the purpose of sending it to the foreign fighters before he had to return the debit card to Hamsa's mom.

### D.   January 2014 - Abdullahi Commits an Armed Robbery to Support the Terrorist Activities of the Foreign Fighters

On January 9, 2014, Abdullahi, his brother A.A., and a third individual committed an armed robbery of a jewelry store in Edmonton, Alberta, Canada.   After entering the store, A.A. pulled a handgun from his jacket pocket and directly pointed it in the face of victim V.B., the owner and lone employee of the jewelry store who was behind a jewelry display case.   Abdullahi then jumped over the display case and along with his cohorts physically restrained V.B. while he struggled and cried for help.   When Abdullahi and the third individual physically forced the V.B. into the rear of the store, V.B. fell to the ground, suffering injuries to his back.   They then held V.B. on the ground as he continued to struggle and scream for help.   While V.B. was on the ground, they forcibly covered his mouth with their hands and placed a towel over his head.   During the struggle, V.B. was told, "*We could just kill you, but we don't want to, just keep quiet. keep quiet!*"   While V.B. was being held on the ground by Abdullahi, A.A. emptied approximately $20,000 to $30,000 worth of jewelry from one of the display cases into a pillow case.

Two neighbors in an adjacent business overheard V.B.'s cries for help and ran to the business.   They were able to observe the ongoing robbery through the glass door and window of the jewelry store.   One of them called the police while the other attempted to prevent Abdullahi and his cohorts from fleeing by holding the outer door closed.   However,

15CR622-W

1   after the neighbor heard one of the robbers yell out, "*Just shoot him. Just shoot him*" and

2   observed a handgun pointed at him, he backed away. Abdullahi and his accomplices then

3   fled the area with the loot in a minivan shortly before law enforcement arrived on the scene.

4   The Abdullahi and his cohorts actions were captured on the store's video surveillance (see

5   photos below).



*3rd robber (l), Abdullahi (c), A.A. (r)*



15CR622-W

1
2
3
4
5
6
7
8



***A.A. (pointing handgun at V.B[6].) and Abdullahi (jumping display case)***

Although store video surveillance depicting the armed robbers was broadcast on the television and internet media, the crime remained unsolved by the Edmonton Police Department ("EPD") for over two years. Abdullahi and his brother A.A. were eventually identified as two of the robbers due to the 2015 recovery of the aforementioned draft emails used by Abdullahi and his coconspirators. In draft emails to Hamsa and the other Canadian travelers, Abdullahi indicated that they committed the robbery for the purpose of financing the foreign fighters. Abdullahi also described how they narrowly escaped getting caught by police and the difficulties he was experiencing in trying to pawn the stolen jewelry because video surveillance of the robbery had been on the local media. Abdullahi added that he was spending a lot of time trying to fence the jewelry store loot so he could send the foreign fighters money. In addition to the draft email communications, EPD was able to match Abdullahi's known palm print with a latent palm print lifted from the jewelry display case following the robbery. As further proof that the robbery was committed to finance the travel of Douglas and Hanad, on the day of the armed robbery, A.A. sent a private Facebook message to Douglas stating that he would be sending him money and asked whether he still planned to leave for Syria in the near future (i.e., *ima send u sum loot. u still smashin soon."*). Douglas responded, God willing (*"in sha allah"*), and instructed A.A. to contact him via Marchello's phone.

---

[6]        At the time of the robbery, V.B. was 64 years of age. Shortly after the robbery, he closed down his business which he had been operating since 1989 due to the emotional and physical injuries suffered during the robbery.

15CR622-W

Abdulllahi's actions in committing the robbery was part of his and his conconspirators' plans to finance their violent jihadist activities.  For example, in a draft email communication from Hirsi, he encouraged Abdullahi and others raise money by committing crimes against the "kuffar" (non-believers), such as theft and fraud.

**E.    Late February 2014 through Early March 2014 – Abdullahi Wires Money for Douglas and Hanad's Travel to Syria and to Support the Canadian Foreign Fighters in Syria**

On March 9, 2014, Hanad and Douglas departed the U.S. on separate flights for Turkey.  Hanad traveled from Minneapolis to Istanbul, Turkey, via France; and Douglas traveled from San Diego to Istanbul, via Germany.  Shortly after arriving in Turkey, both Douglas and Hanad traveled to Syria and joined ISIS.  As discussed below, subsequent investigation revealed that Abdullahi knowingly encouraged and assisted Douglas and Hanad in their travels to Syria to join and fight for ISIS, by among other things, providing the money for the purchase of the airline tickets.

On February 22, 2014, approximately two weeks before Douglas and Hanad departed the U.S., Abdullahi wired $450 to Douglas.  The following day, on February 23, 2014, Douglas wired $350 to  an individual in Gaziantep, Turkey a city close to the border of Syria.  Draft email communications between Hamsa and Abdullahi indicate that Douglas had wired the money to an ISIS operative in Turkey in order to support Douglas' travel and the foreign fighters in Syria.

Thereafter, on February 28 and 29, 2014, Abdullahi wired a total of $2,600 to Douglas and J.A. in San Diego.  On March 7, 2014, Douglas' brother, Marchello, deposited the $2,600 into the bank account of his wife, Hamdi.  The following day, Douglas purchased his and Hanad's plane tickets using the credit/debit card of Marchello's wife.

As evidenced by his draft email communications, Abdullahi knew that the money was intended to fund the travel of Douglas and Hanad to Syria and engage in violent jihadist activities for ISIS.  For example, in draft email messages to Hamsa, Abdullahi stated "*I sent* [Douglas] *the 3 grand* [$3,000] *to get the tickets*," and *I hope y'all understand* [Douglas]

*got the tickets for* [Hanad] *too and I'm working on sending* [Hanad] *the pocket money before he leaves."* In another draft email to Hanad, Abdullahi instructed Hanad to contact Douglas about getting their airline tickets, and that Abdullahi hoped to join them in Syria on the battlefield fighting for ISIS, i.e., "*inshallah* [God willing]*, will all be together on the front lines just like I been dreaming about lately."* And, on March 7, 2014, two days before Hanad's departure, Abdullahi  caused an additional $150 to be wired to Hanad in the Minneapolis area to be used as "*traveling money*" for his trip to Syria.

Hanad did not tell his immediate family of his plans to depart the U.S. and travel to Syria to join ISIS.  Shortly after Douglas and Hanad's departure, she learned of their travels. Hanad's mother then traveled to Turkey and contacted the FBI in an effort to get Hanad to return to the U.S.  In draft email messages, Abdullahi then warned Douglas and Hanad that Hanad's family became aware of their plans and law enforcement might be looking for them in the airport and elsewhere.

### F.    March and April 2014 -- Abdullahi Caused Additional Money to Be Wired to ISIS Operatives in Turkey to Fund Terrorist Activities

As noted above,  after Abdullahi wired Douglas $450, Douglas wired $350 to an ISIS operative in Gaziantep, Turkey.  Abdullahi's draft email communications show that Abdullahi knew that  this individual  was ISIS operative, acting as a recipient of funds to support ISIS' jihadist activities in Syria.  For example in a draft email communication to Abdullahi, Hamsa acknowledged that Abdullahi had sent $3,000 to Douglas, and requested that he send any additional money to the same person in Turkey, used by Douglas. Thereafter, using a family member as the sender, Abdullahi caused additional money to be wired to ISIS operatives in Turkey.   Specifically, on March 24, 2014, he caused approximately $450 to be sent to the same ISIS operative in Gaziantep, Turkey, used by Douglas.  Thereafter, on April 23, 2014, Abdullahi caused an additional $1,000 to be wired to another ISIS operative in Gaziantep.  Notably, just two weeks earlier, Douglas' brother, using family members as the sender, wired $800 to that same individual.

15CR622-W

### G.   Abdullahi Communicates with Foreign Fighters About their Battles Fighting for ISIS Syria and Joining them on the Battlefield

As evidenced by draft email communications, Abdullahi knew that the persons he assisted in traveling to Syria and the monies provided would be used in preparing for, and carrying out violent terrorist activities, including the murder, kidnapping and maiming of persons in foreign countries.  For example, in a draft email to his cousins fighting in Syria, Abdullahi stated that he heard they were successful in killing their enemies, and that Hirsi was a very good sniper, i.e., "*I heard y'all got b's* [bodies] *under your belt  . . .. I heard* [Hirsi's] *three point shot* [sniper shot] *is no joke I always knew that man was a hard brother.*"[7]  In several other draft emails to Abdullahi and others, Hamsa urged them to join the foreign fighters in Syria (i.e., *"catch the caravan"*) because the fighting (i.e., *"playoffs"*) was becoming more intense.  Although Hamsa stated that they were winning the battle in Syria (i.e., *"I got some good news that were smashin manz in ball"* ), he warned them if they did not travel soon, they might not see each other because of the possibility he and his fellow foreign fighters could die in battle (i.e., *"sub-out"* or *"benched.*) any day.  Hamsa also described the groups they were fighting against as devious cowards who were being aided by the United States and its western allies.  This description corroborates that Hamsa and his coconspirators were fighting for ISIS against the western supported Free Syrian Army.

In response, Abdullahi, as well as Marchello, expressed a desire to join Hamsa and his coconspirators on the battlefield fighting for ISIS.   In one draft email to the foreign fighters, Abdullahi stated that he prayed for them, praised their fighting and planned to join them.  He also lamented about not being able to join them sooner, stating "*Its just gonna take a little extra time to get my paperwork and stack on some loot* [money], *walahi* [I swear] *brother my days here are numbered.*"   In a draft email to Hirsi, Abdullahi again promised that he would join the foreign fighters in Syria (i.e., *"nothing is going to keep me*

---

[7]   In an additional effort to avoid law enforcement detection, Abdullahi and his coconspirators communicated using nicknames and in code, using basketball and football terms to describe the battle situations in Syria.

15CR622-W

*way from seeing y'all I promise.*").  In a draft email to Hamsa, Marchello also stated that Abdullahi and he planned to join Hamsa and others in Syria ("*Inshallah me and the brothers will meet you in the field soon . . . me and phish are missing out on the action*").  *Id.*  In another draft email to Abdullahi, Marchello again discusses their shared desire to join the foreign fighters in Syria on the battlefield, i.e., "[we are] *missing out on all of these rewards and blessings . . . we supposed to be with them and we need to make the preparation to get to them ASAP, inshallah."*

### III

### THE STATUTORY SENTENCES AVAILABLE

Abdullahi stands convicted of conspiring to provide material support to terrorists and providing material support terrorists – two separate violations of 18 U.S.C. § 2339A, which each carry a maximum sentence of 15 years, and a fine of not more than $250,000. The cumulative sentence for both counts is imprisonment for 30 years, fines of $500,000.

### IV

### SENTENCING GUIDELINES ANALYSIS

#### A.    Parties' Guideline Calculations

Pursuant to the plea agreement, the parties jointly agreed to the following sentencing guidelines:

| | |
|---|---|
| Base Offense Level (BOL) [USSG § 2M5.3 – *Providing Material Support for a Terrorist Purpose*] | 26 |
| Terrorism Enhancement [USSG § 3A1.4(a) – *Offense Involved a Federal Crime of Terrorism*] | +12 |
| Acceptance of Responsibility USSG §§ 3E1.1(a) and (b) | -3 |
| Adjusted Offense Level (AOL): | 35 |

The parties also agree that pursuant to the Terrorism Enhancement of USSG **§** 3A1.4(b), Defendant's Criminal History Category is increased to a Category VI, which results in an advisory guideline sentencing range, before any other variances, of 292 to 360 months

(AOL 35; CHC VI).[8]   As discussed more fully below, the United States submits that a consideration of all the 18 U.S.C. § 3553(a) factors warrants a sentence of 240 months (20 years) in custody.

## B.   Probation Department's Guideline Calculations

The Probation Department's calculations differs from the parties' calculations in two respects – a determination of the base offense level and the grouping of counts.  First, the Probation Department calculates that the applicable base offense level for Abdullahi's violations of section 2339A (material support to terrorists) is a level 33 under USSG §§ 2X2.1 (aiding and abetting the underlying offense) and 2A1.5(a) (conspiracy to commit murder), rather than a level 26 under USSG § 2M5.3 (material support), as agreed to by the parties.  *See* PSR ¶ 57.  Second, the Probation Department calculates that the conspiracy and substantive 2339A counts of conviction are not closely related counts under USSG §3D1.2, resulting in an additional three-level increase in Abdullahi's BOL level under USSG §§ 3D1.2 and 3D1.4.  *Id.* at ¶¶ 55-86.  The application of one or both of these Probation Department's recommendations results in an advisory Guideline range of 360 months, the statutory maximum, rather than the 292 to 360 months range as calculated by the parties.

The United States submits that the Court should follow the Guidelines agreed to by the parties.  First, even if this Court agrees with the Probation Department's application of section 2X1.2 to determine the applicable base offense level, the appropriate "underlying offense" is found in Section 2M5.3 ("Providing Material Support or Resources … for a Terrorist Purpose"), which has a base offense level of 26.  Second, if the applicable underlying offense is found in Section 2M5.3, this Court is not precluded from treating Abdullahi's section 2339A conspiracy and section 2339A substantive counts of conviction as closely related counts under section 3D1.4.  However, even if this Court disagrees with the parties' calculations of the advisory guideline sentencing range, the United States

---

[8]   The advisory guidelines range of 292 to 365 months is limited is by the statutory maximum of 360 months or 30 years.

16

submits that a consideration of all the aggravating and mitigating factors of 18 U.S.C. § 3553(a) still warrant that the Court impose the twenty-year custodial sentence recommended by the parties.

## V
## SECTION 3553(a) SENTENCING ANALYSIS

### A.   The Section 3553(a) Sentencing Factors Support a Sentence of 240 Months

As part of the sentencing process, the court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing.  Here, a balanced consideration of the section 3553(a) factors supports the 240-month sentence jointly requested by the parties.

### 1.    The Nature and Circumstances of the Offense

Obviously, terrorism crimes are very serious.  Terrorism crimes strike at the very heart of our national security and the obligation of the U.S. Government to ensure the safety of persons within the U.S. and abroad.  Here, the severity of Abdullahi's conduct cannot be overstated.  He gravitated towards and embraced the violent ideology of ISIS – a terrorist group that has murdered thousands of persons, including U.S. citizens, in Syria and elsewhere and promoted, and taken credit for, lethal attacks against civilians on U.S. soil and elsewhere.   Fully aware of this, Abdullahi provided finances essential to ISIS' terrorist activities in Syria, and aided in providing resources necessary for its very survival – personnel in the form of six North American nationals.

Abdullahi's support of ISIS and its terrorist activities was not a brief frolic. Beginning in the fall of 2013 and continuing for months into 2014, he acted as a North American facilitator of individuals seeking to travel to Syria and fight for ISIS.  As such, he provided support, encouragement and finances to the six North American foreign fighters in furtherance of both their travel to Syria to join ISIS and their violent jihadist activities on the battlefield.  This included gathering money in Canada to send to the foreign fighters in Syria; causing $1,800 to be wired to ISIS operatives in Turkey to support the ISIS foreign fighters, and wiring $3,150 to the United States to fund the travel of Douglas McCain and

15CR622-W

Abdullahi's 18-year old cousin to Syria to fight for ISIS.  At the same time, Abdullahi and his coconspirators created and regularly used email accounts in order to facilitate their criminal conspiracy, and at the same time, avoid law enforcement detection.  Among other things, Abdullahi and his coconspirators used one email account to: (1) recruit and encourage others to join ISIS: (2) facilitate the travel of foreign fighters to Syria by coordinating the wire transfer of travel money, providing contact information for ISIS operatives in Turkey, and providing information how to avoid detection by law enforcement during their travels; (3) provide information regarding the foreign fighter's violent activities on the battlefield in Syria; (5) relay the monetary needs of foreign fighters in Syria; and (6) provide the names of ISIS operatives in Turkey to whom individuals should wire money.  In those communications, Abdullahi also showed his deep commitment to ISIS' violent ideology by expressing a desire to join and engage in violent jihad with his coconspirators/ISIS foreign fighters on the battlefield in Syria.

Even more egregious is the fact that Abdullahi funded these violent jihadist activities by committing a violent armed robbery of a jewelry store.  Defendant's violent act not only robbed a 64 year old man of over $20,000 in jewelry, but caused lasting physical and emotional trauma to that victim – who closed his business after the robbery.  The entirety of Abdullahi's criminal conduct represents a unique and violent brand of criminality that simultaneously shows no respect for human life or the rule of law.  He committed violent acts to support the violent terrorist activities of one of the most deadly and brutal terrorist organizations on this planet.  Under such circumstances, a 240-month sentence is entirely appropriate.

### 2.    The History and Characteristics of the Defendant

Abdullahi is a single 37-year old Canadian national, born in Mogadishu Somalia.  Due to the civil war in Somalia, he and his family fled to Kenya at young age and eventually traveled to the United States.  Abdullahi lived in the greater Minneapolis area and San Diego before moving to Edmonton, Canada with his family in or about 2012.  At the time of his

15CR622-W

criminal conduct, Abdullahi was 30 years old, and his coconspirators consisted mainly of his cousins and other lifelong friends from San Diego, Minneapolis and Edmonton.

Abdullahi's criminality did not begin with the instant offense.  While he does not have any felony convictions,  his criminality did not begin with the instant offense. From 2002 through 2011, Defendant suffered several misdemeanor convictions and arrests, including convictions for disorderly conduct, riot in the third degree, curfew violations, providing false information/ID to a police officer (four times); carrying a firearm without permission, as well as arrests for driving on a suspended license, disturbing the peace, fighting in public and resisting arrest.

In examining his characteristics, it is notable that following the death of his coconspirators overseas, Abdullahi appeared to abandon his support of ISIS and jihadist activities and there is no record of him being involved in any other criminal activity.  Rather, it appears that he was gainfully employed and supporting his family.  The United States also recognizes that in entering his guilty plea, Abdullahi has accepted full responsibility for his criminal conduct.  Defendant has also demonstrated guilt and remorse for his criminal actions, which among other things, contributed to the loss of the lives of his four cousins and his friend, Douglas McCain.  On balance, these mitigating factors do weigh in favor of this Court imposing a sentence of 240 months, below the statutory maximum of 360 months.

### 3.    Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment

As expressed above, Abdullahi's offenses are very serious.  As with all cases, the punishment should be just and tailored to the particular matter.  Here, Defendant's relevant conduct included committing a violent robbery and providing material support to terrorists and a foreign terrorist organization – an organization that represents a threat to the safety of our country and has killed innocent civilians abroad.  Moreover, Defendant's participation in this conspiracy resulted in providing at six foreign fighters, including his 18-year old and 19-year old cousins, to further the heinous goals of  ISIS.  Such criminal conduct requires a substantial sentence of 240 months, which reflects the gravity of his criminal conduct.

15CR622-W

### 4.    Afford Adequate Deterrence

The 240 month sentence recommended by the parties addresses both the need to deter Abdullahi from future criminal activity (i.e., specific deterrence) and the need to deter others from engaging in such activity(i.e., general deterrence).

Specific Deterrence – As noted above, Abdullahi has accepted responsibility for his entire criminal conduct.   Abdullahi's crimes, while violent and extreme, were born of extreme interpretations of Islamic religion and ideology, not opportunity and profit.   Since the death of his cousins in November 2014, Abdullahi extremist views appear to have abated and there is no evidence that he continued to support ISIS or its jihadist activities.  As such, this factor weighs in favor of a sentence below the statutory maximum.

General Deterrence – Past and recent events have demonstrated the enormous toll in loss of life that terrorism crimes create in communities across the country.  And, with the spread of ISIS' poisonous ideology into the internet and social media, the jihadist philosophy shows no signs of abating.  Though Abdullahi was not very young at the time he participated in the conspiracy to provide material support, such jihadist ideology is often attractive to young adults, such as Abdullahi's younger cousins, who have an unrealistic but romanticized notion of the world.  Here, a substantial sentence of 240 months would send a strong message to all person harboring any notion that serving, joining or aiding ISIS in any manner is meaningful and worth the risk.  A substantial twenty year sentence for Abdullahi's conduct sends the appropriate message to others – providing or conspiring to provide material support to terrorists will be pursued aggressively, and those who commit such crimes will be convicted and punished accordingly.

### 5.    Unwarranted Sentencing Disparities

Section 3553(a) also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added).   Since Abdullahi's foreign fighter-coconspirators were all killed in Syria, the only individual who faced a sentence for criminal conduct relating to the section 2339A conspiracy is Marchello,

15CR622-W

who received a custodial sentence of 10 years.  However, a comparison with Marchello's 10-year sentence is improper here for several reasons.  Unlike Abdullahi, Marchello was not charged with material support violations, rather he was charged with, and plead guilty to, firearms violations and false statements involving terrorism.  Additionally, a comparison of Marchello and Abdullahi's criminal conduct reveals that there are unique and aggravating factors present here that warrant the more substantial sentence of 20 years in custody.  Marchello may have provided some assistance to his brother Douglas in his travel to Syria to fight for ISIS by depositing cash into a bank account for purchase of Douglas' airline tickets and wiring $800 to an ISIS operative.  However, as discussed above, Abdullahi's involvement in the conspiracy was much more extensive and egregious.  For example, Abdullahi, not Marchello, actually provided the money used to finance Douglas' travels.  Additionally, Abdullahi, unlike Marchello, also assisted the travel and fighting efforts of five other foreign fighters.  Finally, Abdullahi committed a violent armed robbery in order to finance the foreign fighter's terrorist activities.

## VI

## <u>CONCLUSION</u>

For the above stated reasons, the United States respectfully requests that this Court impose a sentence of 180 months as to Count 1, to be followed by a sentence of 60 months as to Count 2, to run consecutively for a total sentence of 240 months.  The Court should also impose a three-year term of supervised release as to each Count to run concurrently, and a $100 Special Assessment for each felony count.

DATED: October 6, 2022.                    Respectfully submitted,
                                           RANDY S. GROSSMAN
                                           United States Attorney

                                           */s/Shane Harrigan*
                                           SHANE HARRIGAN
                                           FRED SHEPPARD

21

15CR622-W